UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WALTER SARRAT and | * | Civil Action No: 14-1017 |
| HILDA SARRAT | * | |
|   Plaintiffs | * | Section: |
| | * | |
| UNIVAR U.S.A., Inc. | * | Judge: |
|   Defendant | * | |
| | * | Magistrate: |

****************************************************************************

# COMPLAINT

## The Parties

**1.**

A. **The Plaintiffs are:**

   i. **Walter Sarrat,** a person of the full age of majority domiciled Tangipahoa Parish, Louisiana; and

   ii. **Hilda Sarrat, wife of Walter Sarrat, and** a person of the full age of majority domiciled Tangipahoa Parish, Louisiana.

B. **The Defendant is:**

**Univar U.S.A. Inc.,** the successor corporation to **ChemCentral corporation** and **Southern Solvents & Chemicals Corporation, is** a Washington Company whose principal business office is located in Redmond, Washington, authorized to do business in Louisiana, and whose agent for service for process is Corporation Service Company, 320 Somerulos St., Baton Rouge, La 80802. (hereinafter "**Univar**").

## Jurisdiction and Venue

2.

The Defendant corporations, Univar, U.S.A. Inc. is domiciled in King County, Washington.

3.

Plaintiffs Walter & Hilda Sarrat are domiciled in Tangipahoa Parish, Louisiana.

4.

This Court has jurisdiction under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.

Venue is proper in this District under 28 U.S.C. § 1391 (b)-(c) because the defendants are doing business in this District and because the events giving rise to the plaintiffs' causes of actions arose in this District.

## Background

6.

From 1967 through 1969 Mr. Walter Sarrat was employed by Gencote, Inc. on Jefferson Highway in Jefferson Parish Louisiana as a polyurethane applicator. He applied polyurethane by spray application to large objects such as barges, sugar silos and other metal object to prevent corrosion.

7.

Applying polyurethane coatings involved using toluene as a solvent in the application process, to clean out spray equipment and nozzles, to clean up overspray and to remove

polyurethane from his skin and clothing.

8.

During clean-up, undiluted Toluene was sprayed directly on hands, arms and clothing to remove polyurethane.  This resulted in Mr. Sarrat's skin and clothing being soaked with toluene.  Mr. Sarrat was unaware that toluene contained benzene,  a cancer causing chemical, and was advised  that toluene was safe and posed no hazard to his health in the manner it was being used.

9.

Toluene contains up to 2.5% benzene.[1]  Mr. Sarrat was exposed to benzene through inhalation and skin contact each time he worked with toluene.

10.

When applying polyurethane coatings a mixture of polyurethane and toluene was used with a 1 millimeter spray  nozzle.

11.

For clean-up undiluted toluene was used in the sprayers.  The 1 millimeter spray nozzle created a very fine breathable mist of toluene.   He could smell the aerosolized product when it was used and it would often make him dizzy or lightheaded

12.

His employer purchased barrels of Toluene from ChemCentral, Inc. a/k/a Southern Solvent & Chemicals Corporations at 333 River Rd., New Orleans, 70181.   ChemCentral Corporation and merged into Univar, U.S.A., Inc.

---

[1] CP Chem Material Safety Data Sheet,  Toluene, (Commercial Grade), 10/19/2000,  **Exhibit 1;** Lyondell-Citgo Refining Co., Material Safety Data Sheet, toluene – commercial grade, 3/29/1995, LCR-Frias01749**, Exhibit 2**

13.

Toluene was removed from the barrels and put into 5 gallons cans, which were then used to fill the sprayer.   After the application of the urethane, the sprayer was connected to a drum of the Defendant's Toluene to clean overspray, tools, spray nozzles, skin and clothes. The barrels were marked "Toluene" and "Southern Solvents & Chemicals." There were no other warnings or labels on the barrels and no other warning information was provided by the suppliers.

14.

As a result of the activities described above, Mr. Sarrat was exposed to benzene and toluene  each work day of a 40 hour work week during his employment between 1967 and 1969.

15.

At all material time herein, Southern Solvent & Chemical (now **Univar**) was the manufacturer and/or supplier of the chemicals used by Mr. Sarrat while employed by Gencote.

16.

Mr. Sarrat sustained tissue damage shortly after each exposure to benzene, resulting in distinct bodily injuries in each year from 1967 through 1969.  As a result of this exposure to benzene and toluene, Mr. Sarrat has developed Chronic Lymphocytic Leukemia (CLL)

17.

The health hazards of benzene have been recognized by the petroleum and chemical industries for over one hundred years. Benzene has been recognized as a carcinogen known to cause leukemia. By the end of 1948, it was widely known to those in Defendant's industry that exposure to benzene could cause a myriad of ill health effects including such diseases as leukemia, multiple myeloma, lymphoma, myelodysplastic syndrome and other blood disorders.

18.

Through industry and medical studies unknown to plaintiffs, the Defendant knew or

should have known of the health hazards inherent in the products it manufactured, distributed, sold, supplied, and transported. The actions or inactions of the Defendant constitutes gross negligence and demonstrates a reckless disregard for the rights and safety of others. Furthermore, the Defendant committed numerous tortious acts that include, without limitation, negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of benzene and precautionary measures in regard thereto, as specifically alleged below.

19.

As a direct and proximate result of exposure to benzene and products containing high levels of benzene, Mr. Sarrat suffered injury including, but not limited to, Chronic Lymphocytic Leukemia, physical damage, and severe physical and mental pain, fear of further disease processes, disability, medical expenses, and loss of enjoyment of life.

20.

The development of Leukemia (including CLL) as a result of chronic benzene exposure has been well documented, and death resulting from Chronic Lymphocytic Leukemia has been associated with benzene exposure.

21.

Chronic Lymphocytic Leukemia is a malignant disease that affects the blood and bone marrow.

22.

The latency period for the development of injuries after benzene exposure has been known to range from less than 5 years to in excess of 50 years.

23.

Practically all of the adverse chronic effects of exposure to benzene and its oxidation

products are a result of their influence on the blood forming system.

24.

Exposure to benzene is usually through inhalation, although skin contact may occur. Chronic benzene poisoning results from repeated or continuous exposure to relatively low concentrations of benzene vapors.

25.

Long-term benzene exposure may also adversely impact marrow and bone production. Breathing benzene can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Breathing very high levels of benzene can also result in death.

26.

In the September 1948 the American Petroleum Institute (API), *Toxicological Review, Benzene*, the authors recommended precautionary measures for workers who are exposed to benzene. [2] Defendant as a manufacturer and supplier in the Petroleum and Chemical Industry knew or should have known the information published by the American Petroleum Institute.

27.

As of 1948, the American Standards Association and most states had set an arbitrary limit of 100 ppm as the maximum permissible benzene concentration for workers exposed to this substance during an 8-hour day. In 1948, the American Petroleum Institute reported that "In as much as the body develops no tolerance to benzene, and as there is a wide variation in individual susceptibility, it is generally considered that the only absolutely safe concentration for benzene is zero."[3] The concentration of benzene vapor in the air should be checked regularly in situations

---

[2] 1948 Edition of the American Petroleum Institute (API), *Toxicological Review, Benzene*
[3] 1948 Edition of the American Petroleum Institute (API), *Toxicological Review, Benzene*, pp.4 Section IV, ¶3,

where excessive exposures are apt to be encountered.[4]

28.

The API review stated "The safety measures necessary for the prevention of benzene poisoning are primarily those designed to prevent the inhalation of benzene vapor. Ventilation should be designed to prevent the inhalation of benzene vapor,"[5] and should be designed to prevent "toxic concentrations of the vapor from reaching the breathing zone of workers."[6] Individuals who must be exposed to benzene vapor should be rotated to reduce their exposure time to a minimum. When excessive concentrations are unavoidably encountered in operations—such as the cleaning in vats or tanks—a supplied air respirator or self-contained breathing apparatus should be employed.[7] The API also advised that "Skin contact and possible dermatitis from benzene should be avoided entirely if possible; but, if the hands must contact the solvent, then neoprene gloves should be used."[8]

29.

The Defendant knew or should have known about the causal relations between benzene, toluene and leukemia by 1967. As early as 1942, an article in the Journal of the American Medical Association reported that Toluene is used extensively as a solvent in the lacquer industry, and recognized that only in exceptional circumstances is a worker exposed to pure toluene, that in most industries it also contains benzene and xylene.[9]

---

[4] *Id.*
[5] *Id*. at p.5
[6] *Id*. pp.5, Section VII.
[7] *Id*.
[8] *Id*. at 5
[9] **Von Oettingen, et al,** *The Toxicity and Potential Dangers of Toluene*, Journal of the American Medical Association, Vol. 118, 579-584 (1942)

**Negligence**

30.

The Defendant was negligent, grossly negligent and is strictly liable for the damages caused by its product.

31.

The Defendant breached duties, which it owed to Mr. Sarrat to exercise proper care in manufacturing, distributing and selling its products.

32.

**Univar** breached duties, which it owed to Mr. Sarrat to exercise proper care in manufacturing and selling its respective products. More specifically, it breached the following duties:

- A. to design its products in such a manner that they did not pose a health hazard when used in a normal, intended and foreseeable manner;

- B. to fully test its respective products for health risks associated with the normal, intended and foreseeable use of their products;

- C. to fully instruct and warn users of its products so as to eliminate or reduce the health hazards associated with their normal and intended use;

- D. to fully warn foreseeable users as additional medical knowledge became available concerning the health hazards associated with their products;

- E. to provide adequate warnings to the purchaser of its products;

- F. to make reasonable efforts to ensure that all appropriate warnings, health hazards and need for protective equipment were communicated to the ultimate user of its products;

G. to research or investigate the safety and health risks of the products they sold, including the constituents of each product; and

H. to research, study and be aware of medical and scientific studies concerning the health hazards of benzene;

33.

Louisiana C.C. 2315 provides, "Every act whatever of man that caused damages to another obliges him by whose fault it happened to repair it." **Univar**, is liable for the damages caused by Mr. Sarrat's exposure to its benzene containing product, toluene, while performing work for Gencote as described above.

34.

As a direct and proximate result of the Defendant's negligent breach of its duties to Mr. Sarrat the Plaintiffs have sustained injuries, damages and losses.

35.

The scope of the duties breached by the Defendant encompasses the risk of the injuries sustained by the plaintiffs. The duties breached were intended to protect the Mr. Sarrat from the injuries he sustained. The Defendant's breach of its duties constituted the direct legal cause of the injuries to Mr. Sarrat.

**Strict Product Liability**

36.

**Univar's** benzene containing products were defective; the products were defective when they left the Defendant's possession and control; the benzene containing product reached the user without substantial change in the condition in which it was sold, and Mr. Sarrat's injury was the proximate result of the defective condition of these products, which were unreasonably

dangerous to the ultimate consumer when put to their normal intended use.

37.

Mr. Sarrat suffered exposure to benzene and toluene from Univar's product when used in the normal, foreseeable, and intended manner.

38.

The Univar's Toluene was defective, presented an unreasonable risk of harm, and was unreasonably dangerous under normal use at the time the product left the Defendant's control.

39.

Mr. Sarrat was an intended and foreseeable users of the Univar's defective product.

40.

Defendant, **Univar** is strictly liable under Louisiana Law, pre-Louisiana Products Liability act (1988), for the damages caused by its product, toluene, because its product was (1) Unreasonably dangerous per se; (2) Unreasonably dangerous in construction; (3) Unreasonably dangerous in design; and (4) unreasonably dangerous by reason of failure to warn.[10]

41.

**Univar** breached duties owed to Mr. Sarrat in failing to exercise proper care in manufacturing and selling its product. More specifically, **Univar** breached the following duties:

**A.** to fully instruct and warn users in the uses of its product so as to eliminate or reduce the health hazards associated with its normal and intended use;

**B.** to fully warn foreseeable users as additional medical knowledge became available concerning the health hazards associated with its product;

**C.** instructions and warnings that should have accompanied the sale of such product; and

**D.** to make all reasonable efforts to ensure users of its product were aware of its health

---

[10] *Halphen v. Johns-Manville Sales Corp.* 484 So.2d 110, 117 (La.,1986).

hazards and the protective equipment necessary to prevent exposure and harm from the product or its constituent chemicals.

42.

The defects in the defendant's products include, but are not limited to, the following:

A.   inherent characteristics (known to the Defendant) that gave the products such a potential for causing health problems as to render the products unreasonably dangerous per se;

B.   lack of warnings or lack of sufficient warnings of the inherently dangerous properties of the products when used in a foreseeable manner;

C.   lack of warnings or lack of sufficient instructions for eliminating the health risks inherent in the use of the products;

D.   defective designs failing to eliminate benzene in products that did not require benzene, and

E.   other acts which may be revealed at the trial of this matter.

43.

**Univar** knew or should have known that its products posed a significant risk of harms to its users, potentially causing blood disorders and blood cancers. **Univar** knew or should have known that users of its product (Toluene) were exposed to hazardous levels of benzene.

44.

The Defendant sold its products with conscious disregard for the safety of users of the products and other persons who might be injured thereby.

45.

As a result of the defective and unreasonably dangerous condition and composition of the benzene-containing products manufactured, distributed and/or sold by **Univar**, Mr. Sarrat inhaled benzene fumes and other harmful substances emitted by the normal use of the products, proximately causing Chronic Lymphocytic Leukemia related to benzene exposure from which he suffers.

46.

**Univar's** product was unreasonably dangerous in construction or composition. At the time the product left control of the **Univar**, it contained high concentrations of a cancer causing substance, benzene, which made the products more dangerous than it was designed to be.

47.

**Univar's** product was unreasonably dangerous per se. The danger of use of the product, whether foreseeable or not, outweighed the utility of the product.

48.

**Univar's** product was unreasonably dangerous in design. The product was manufactured with constituents that contained high levels of benzene. Less toxic and cheaper design alternatives were available at the time of manufacture.

49.

**Univar's** product was unreasonably dangerous in design. Defendant failed to conduct adequate research and investigation into the health effects of their products.

50.

As the product designer and manufacturer, Defendants had a duty to keep abreast of scientific knowledge and discoveries concerning the chemicals it sold.  Defendant had a duty to

test and inspect its products. **Univar's** breached this duty.

51.

Exposure to benzene from the **Univar's** product, toluene, resulted from the normal, foreseeable, and intended use of the product, without substantial change in the condition in which the defendants sold or supplied the product.

52.

**Univar's** products were products were defective, presented an unreasonable risk of harm, and were unreasonably dangerous under normal use at the time the products left the defendant's control.

53.

**Univar** was negligent in manufacturing, selling and distributing benzene containing products that were unreasonably dangerous, and where **Univar** failed to warn the ultimate user of the product that exposure its benzene containing products could injure the blood and blood forming organs, or that such exposures could later cause the development of cancers such a leukemia.

**CONCEALMENT, MISREPRESENTATION, FRAUD**

54.

The Defendant was aware of the dangerous condition presented by exposure to benzene, and that Mr. Sarrat would suffer from diseases and other ill health effects as a result of these exposures. Defendant failed and/or willfully withheld knowledge of the health dangers from exposure to benzene.

55.

Under Louisiana law fraud may be either active or passive. Passive fraud may arise from a defendant's silence or failure to act. To state a claim for passive fraud, Louisiana courts generally require a showing of the following elements: (1) the information that was withheld, (2) the general time period during which the fraudulent conduct occurred, (3) the relationship giving rise to the duty to speak, and (4) what the person or entity engaged in the fraudulent conduct gained by withholding then information. *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 598 (ED. La.1993). In support of their fraud claims against the Defendants, the plaintiffs would respectfully show as follows:

56.

**Univar** knew or should have known information on the hazardous nature of benzene, including a publication from the U.S. government agency for public health: "*The Toxicity and Potential Danger of Aliphatic and Aromatic Hydrocarbons*", W.F. Von Oettingen, Division of Industrial Hygiene, National Institute of Health, U.S. Public Health Service, 1942.

57.

Prior to 1967, **Univar** knew or should have known that benzene exposure had numerous adverse effects on human health including:

    A.    Death could be cause by short term exposure of 20,000 ppm;

    B.    Chronic benzene poisoning could occur from repeated absorption of small doses of benzene over a period of days, weeks or months.;

    C.    Death could be caused from chronic exposures to benzene as a result of its effects on the blood;

D.  Chronic benzene exposure could cause damage to the nervous system, the gastrointestinal tract, to the liver, kidneys, cause hemorrhages from the skin and mucous membrane, and cause changes in the blood;

E.  Benzene exposure could cause changes in the blood including anemia, leukocytosis, lymphocytosis and leukopenia, and thrombopenia;.

F.  The effect of benzene on the blood is as a result of benzene causing an injurious effect on the bone-marrow another myeloid structures;

G.  Benzene exposed workers should undergo periodic medical monitoring, particularly of changes in the blood;

H.  Chronic benzene poisoning leads to injury of the bone- marrow;

I.  Chronic Benzene exposure results from repeated or continuous exposure to relatively low concentration of benzene exposure;

J.  The toxic action of chronic exposure is mainly exerted on the hematopoietic system (blood forming tissues);

K.  It could take months or even years for symptoms of benzene exposure to manifest;

L.  Possible effects on the blood are leukopenia (decrease in white blood cells), neutropenia, severe anemia, thrombopenia (drop in platelet count);

M.  Individual reactions to chronic benzene poisoning vary as to their effects on the blood – it may cause a decreases in red-cells, white-cells, platelet, any combination of these, a reduction or increase in cells in the bone marrow, or leukemia.

58.

In spite of this knowledge, Univar failed to provide any health warning on their drums of Toluene between 1967 and 1969.  Additionally, Univar failed to disclose its Toluene contained benzene, that exposure to benzene was hazardous, or to provide any information concerning recommended protective equipment.

59.

As manufacturer, sellers and distributors of the product, Univar had a duty to inform users of the hazards associated with use of the product.

**DAMAGE**

59

As a result of the acts and omissions of *Univar*, the Plaintiffs are entitled to recover money damages, both past and future, for all elements of damages allowed by Louisiana law. These damages include but are not limited to:

a. Past, present, and future medical care, convalescence, mental and physical therapy and all other health care expenses;

b. Past, present, and future physical pain and suffering;

c. Past, present, and future mental anguish and emotional distress;

d. Physical impairment;

e. Loss of enjoyment of life;

f. Loss of society, consortium, companionship, services, nurture, and love and affection;

g. Any other losses Plaintiff have or will sustained as a result of the injury alleged.

## LOSS OF CONSORTIUM
59.

Due to the Defendant's negligence and Mr. Sarrat's resulting injuries, he has suffered loss of consortium, loss of services, loss of affection, and loss of nurture and is entitled to damages.

60.

Additionally, Hilda Sarrat, the wife of Mr. Sarrat, has suffered loss of consortium, loss of services, loss of affection, in relations with her husband as a result of his injuries.

### Discovery Rule/ Contra Non Valentem
60.

The Plaintiffs invoke the protection of the jurisprudential rule of *Contra Non Valentem* which provides that prescription does not run against a party until he knows that his illness is an injury caused by the fault of another.

61.

Mr. Sarrat did not learn that his Chronic Lymphocytic Leukemia could be caused by his exposure to benzene and benzene containing products until shortly before filing suit.

62.

The prescriptive period does not start to run until the plaintiff knew or should have known that his cancer was caused by benzene. Here, the results of the Mr. Sarrat's exposure to benzene was inherently undiscoverable. The cancer took years to develop, and even when the symptoms did manifest, neither his physicians nor Mr. Sarrat detected the link between his benzene exposure and leukemia. The Plaintiff never heard or saw anything that linked benzene to his Chronic Lymphocytic Leukemia until March of 2014. The Plaintiff's Chronic Lymphocytic Leukemia was the product of exposure to chemicals over a period of time rather than at a single

point in time. Mr. Sarrat learned of the link between benzene exposure and Chronic Lymphocytic Leukemia shortly before filing this lawsuit, in March of 2014. It was not until that time that Mr. Sarrat learned that the named Defendant's activities caused damages to his blood forming tissues and ultimately caused his Chronic Lymphocytic Leukemia.

### Jury Trial

63.

The Complainants pray for trial by jury.

### Prayer

64.

For these reasons, the Plaintiffs ask that **Univar U.S.A., Inc.** be cited to appear and answer, and that on final trial, the plaintiffs have:

A. Judgment **Univar U.S.A., Inc.** for the actual and special damages suffered by the Plaintiffs as a result of its conduct;

B. Costs of suit;

C. Prejudgment and post-judgment interest at the highest rate provided by law; and

D. All other and further relief to which the plaintiffs may be entitled.

Respectfully submitted,

*/s/ Amber E. Cisney*
RICHARD J. FERNANDEZ, LSBN 05532
AMBER E. CISNEY, LSBN 28821
**LAW OFFICE OF RICHARD J. FERNANDEZ, LLC**
3000 West Esplanade Avenue, Suite 200
Metairie, Louisiana  70002
Telephone: (504) 834-8500
Facsimile: (504) 834-1511

-and –

L. ERIC WILLIAMS, JR., LSBN 26773
**WILLIAMS LAW OFFICE, LLC**
433 Metairie Rd, Suite 302
Metairie, Louisiana 70002
Telephone: (504) 832-9898
Facsimile: (504) 832-9811
**ATTORNEYS FOR PLAINTIFFS**